1. "A plaintiff in ejectment must recover on the strength of his own title, and not on the weakness of the defendant's title." Code, § 33-101. The only instrument in evidence that purported to transfer title to the disputed land to either the plaintiff or his deceased father, under whom he claimed, was a quitclaim deed, executed in 1939 by the heirs of the father to the plaintiff, which showed no title as against the defendants' prior deeds, and alleged possession at the time of the suit.
2. As to the plaintiff's alleged prescriptive title by twenty-years actual adverse possession, his own testimony and that of the other witnesses showed that all of the disputed sixty-two acres, except about six acres of cultivatable land with a grist-mill which all the testimony showed had been used or occupied by the defendants' predecessor in title at least from 1923 to 1926, was covered by a mill-pond; and that this pond ran dry when a dam broke, either in 1928 according to plaintiff's own testimony, or between 1923 and 1926 according to other witnesses, since which time "there has been no pond." While there was a general inadequate statement by plaintiff that his father, as predecessor in title, had "owned and was in possession" of the disputed premises, "which had gone dry," for thirty years as "timber land," there was no evidence or contention, adequate in legal effect or otherwise, that the father had occupied such land or exercised any dominion over it or any portion of it while covered with water as a mill-pond to the year 1928. Accordingly, since the evidence of and for the plaintiff failed to show any such acts of dominion over the land for twenty years before the filing of the suit, the court did not err in directing the verdict for the defendants, or in refusing a new trial. The plaintiff's case having failed for the reasons stated, it is unnecessary further to consider other questions presented, as to his alleged failure to show a prescriptive title by possession. See Holloway v. Woods, 195 Ga. 55 (23 S.E.2d 254).
Judgment affirmed. All the Justices concur.
 No. 14368. DECEMBER 1, 1942.
In 1941 LeRoy Tapley, one of the heirs-at-law of F. M. Tapley, and grantee under a quitclaim deed made to him in 1939 by the other heirs, brought an action against C. S. Claxton, J. W. Claxton, and C. B. Harrison, to recover sixty-two acres of land described as "lying in the Fortner Mill Pond tail, and being owned by the said F. M. Tapley at the time of his death" in 1938. The plaintiff relied chiefly on a prescriptive title by twenty years or more of actual adverse possession. The defendants relied on actual adverse possession under their deeds in evidence. At the trial in March, 1942, the court directed a verdict for the defendants. *Page 62 
The plaintiff excepted to the refusal of a new trial, on the ground that it was error to direct the verdict, and on the general grounds.
The only deed in evidence to the plaintiff or his deceased father, under whom he claimed, that purported to include the land in dispute was the quitclaim deed made in 1939, to the plaintiff by the heirs of the father. Other deeds in evidence, to and from F. M. Tapley, the father, apparently excluded or did not refer to the "Mill Pond" land in question. In 1904 J. M. Page conveyed to the father 125 acres, bounded on the "east by O. S. Fortner Mill Pond," and 120 additional acres, without any reference to the "Mill Pond" land. In 1926 F. M. Tapley conveyed to Joiner 69 acres of the 245 obtained under the deeds last mentioned, leaving 176 acres. In 1928 F. M. Tapley executed to Mutual Benefit Life Insurance Company a security deed conveying 190 acres, but describing the property as bounded "East by Fortner Mill Pond,"
and the boundary as "being along the line of the high-water mark of the Fortner Mill Pond." A surveyor's plat in evidence, made in 1928, also showed the eastern boundary of the 190 acres as extending only to the high-water mark of the "Mill Pond." In 1933 the insurance company under a power of sale conveyed to itself the land as thus described, and in 1934 reconveyed it to F. M. Tapley. In 1934 he executed to Federal Land Bank of Columbia a security deed conveying 180.2 acres, and describing the land as bounded partly on the north and east by "Fortner Mill Pond,"
and the line as "along the meanderings of Fortner Mill Pond."
In 1937 F. M. Tapley conveyed to E. J. Claxton certain timber for "turpentine purposes" on 176 acres, describing the northern boundary as "Battle Ground Creek," which apparently included timber on the disputed 62 acres.
The defendants put in evidence a deed, made in 1895, from Malinda Price to Beann Fortner, conveying a half interest in 56 acres of land, including the mill known as the "Tapley Old Mill," and a deed, made in the same year, from John W. Harrison to Beann A. Fortner conveying the other half interest in the same property. The defendants introduced also a bond for title, made in 1923, from Mrs. Beann Fortner to W. L. Bailey, conveying 56 acres, and describing the land as apparently including part of the tract in dispute, bounded on the west by F. M. Tapley and others; "possession to be given as soon as the said W. L. Bailey moves and *Page 63 
is ready to begin grinding;" a grist-mill being located on the property. This bond for title was surrendered back to the vendor. Also in evidence was a deed made in 1926, from Mrs. Beann Fortner to C. S. Claxton, one of the defendants, conveying 356 acres, and including the "Fortner Mill Pond proper," and "all water and mill privileges formerly owned by the said Mrs. Beann Fortner and O. S. Fortner; . . also the grist-mill rocks, and all machinery located on said property and formerly operated thereon."
LeRoy Tapley, the plaintiff, testified: "During my father's lifetime he owned and was in possession of 62 acres of land known as Fortner's Mill Pond or Tapley's Mill Pond, which had gone dry, and left the dry land standing there. . . My father was in possession of it thirty years or more; he exercised ownership of that property; there was no cultivatable land, it was timber land. . . He sold the turpentine rights in 1934 and 1935, and Mr. E. J. Claxton is now working it under the lease given him by my father. . . These defendants did not exercise any ownership of this property during my father's lifetime," and "nobody else ever exercised my possession of this land besides my father." Also, that the security deed, executed by the father to the Federal Land Bank included only farming land, and did not include "the Mill Pond," which was "on this side of that land." As to possession by the defendants or their predecessors in title, the plaintiff said: "I have been knowing Mrs. B. Ann Fortner about fifty-five years. . . She was living on this cultivated land adjacent to this pond there ever since I can remember. I don't know that she owned 56 acres in there; I know Will Bailey. I recall that he lived on this land adjacent to the pond from 1923 to 1926. That bond for title [Fortner to Bailey] covers 56 acres of land. Mrs. B. Ann Fortner lived on 6 acres there. It was partof the Pond. . . The dam across that pond is washed away. After Mrs. Fortner sold this land to Mr. Bailey, [she] moved away." As to the pond the plaintiff testified that the "mill pond ran drythe last time in 1928; there has been no pond there since 1928;
and my father then exercised ownership of this property."
John Price testified for the plaintiff, that he did not know who exercised ownership over the disputed sixty-two acres during the last twenty or thirty years, but that, at some unstated time, the plaintiff's father had sawed off a blown-down tree and cut another *Page 64 
tree on the land below the pond, and at another unstated time had fenced some undescribed "part of it;" that Mrs. Beann Fortner had "lived there on the cultivated land until she sold it to Mr. Bailey" around 1923, and he "stayed in possession . . until he turned his bond for title back to her in 1926," and defendants bought in 1926 from her, and "since that time [one of defendants] permitted [witness] to tend and cultivate it without any rent;" that Mrs. Fortner "was in possession of it about forty years; she had a mill-pond, and it backed water on the lands in dispute;" and that he never heard the plaintiff's father "say anything about claiming it."
J. L. Harrison testified for the defendants, that the 1895 deeds from Malinda Price and John W. Harrison to Mrs. Fortner, each conveying a half interest in fifty-six acres in the land and the mill, covered the sixty-two acres in question, as shown on a plat in evidence; that "Mrs. Fortner remained in possession of it from the time she bought it until she sold it to Mr. Bailey," but "he surrendered his interest under a bond for title back to her;" that "there was a pond there at the time these two deeds were made; water covered this land," but there were six acres of land cultivated by Mrs. Fortner on "this side of the mill-house." J. C. Harrison testified, that Mrs. Fortner was in possession of the fifty-six acres covered by the deeds from his father and Mrs. Price to Mrs. Fortner, including "that mill-pond and water privileges," until she made the bond for title to Mr. Bailey, and "actually lived" on part of the land. A. S. Norris testified as to Mrs. Fortner's possession, and that "during those forty some odd years Mrs. Fortner operated a grist-mill on that pond," being in "actual possession" and "operating the mill;" that there were sixty-two acres, six in cultivation, "and the rest of it was in the mill creek and below the dam." E. A. Douglas, a surveyor, who made for the plaintiff a plat in evidence, showing the disputed sixty-two acres, testified that the land lay "between the high-water mark [of the pond] and the run of the creek;" and that "this sixty-two acres is what was one time a part of the pond."
C. S. Claxton, one of the defendants, testified, that the sixty-two acres in dispute were included in the description of the 356 acres conveyed to him by deed from Mrs. B. Ann Fortner in 1926; that this disputed land had been used as a mill-pond for about 75 years *Page 65 
until the dam broke between 1923 and 1926, and a house burned in which Mr. Bailey lived under his bond for title, and he then turned the property back to her; that this defendant bought the land "for the purpose of rebuilding the dam and mill;" that "there was nothing to cultivate but the land where the main dwelling stood, near the dam, for a number of years;" that neither the plaintiff's father, F. M. Tapley, nor his heirs ever put any fence around the sixty-two acres, but that, at some unstated time, there had been some undescribed three or four acres with one or two strands of "bob-wire for a pasture," placed by some of the father's heirs; and that the plaintiff "took down what wire was out there and moved it off the premises before he moved away in 1928."
Testimony as to the return of lands for taxes and payment by the plaintiff, his father, and the defendants, was as follows: After the father bought the 245 acres and sold 69 acres, under deeds as previously stated, leaving 176 acres, he had never since 1926 returned but 176 acres for taxes. From 1930 to 1933 he returned 176 acres, and made no returns in 1933 and 1934. Mutual Benefit Insurance Company, which acquired the land described in the security deed from the father, made returns of 190 acres for taxes during 1933 and 1934; and from 1935, when the father reacquired title, until his death in 1938, he had returned 176 acres. In 1933 two of the defendants returned sixty-five acres for taxation, and from 1935 through 1939 returned sixty acres.